UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ELEANOR SANTANIELLO, by and  :
through her Sister and
Conservator LINDA QUADRINI,  :

    Plaintiff,              :

V.                           :   CASE NO. 3:04-CV-806(RNC)

SYBIL SWEET, ET AL.,         :

    Defendants.             :

## RULING AND ORDER

Plaintiff brings this action under 42 U.S.C. § 1983 alleging violations of the Fourteenth Amendment and a provision of the Medicaid Act, 42 U.S.C. § 1396n(c)(2)(A). Claims are also asserted under Conn. Gen. Stat. §§ 17a-541, 17a-542, 17a-550 and 19a-24. In addition, the complaint contains claims for negligence and reckless and wanton misconduct.[1] The case concerns periodontal disease that worsened while the plaintiff was residing in a group home for persons with developmental disabilities.

Defendants have filed separate motions for summary judgment [doc. ## 239, 251 & 255] and plaintiff has responded with a consolidated memorandum in opposition [doc. # 269]. Oral

---

[1] Plaintiff brings Fourteenth Amendment and 42 U.S.C. § 1396n(c)(2)(A) claims against all defendants; Conn. Gen. Stat. §§ 17a-541, 17a-542, 17a-550 claims against defendants Peter O'Meara and Sybil Sweet ("DMR Defendants") and CLASP Homes, Inc. ("CLASP"); a Conn. Gen. Stat. § 19a-24 claim against defendant O'Meara; negligence claims against CLASP and Kathy Stuart ("CLASP defendants"), and Norwalk Hospital and Mark E. Feigen ("Norwalk Defendants"); and reckless and wanton misconduct claims against the CLASP defendants.

argument has been held on two occasions. For reasons explained below, the motions for summary judgment are granted as to the federal claims, which are dismissed with prejudice, and I decline to exercise jurisdiction over the state law claims, which are dismissed without prejudice.

I. Background

The evidence in the record, viewed in a manner most favorable to the plaintiff, would permit a jury to find the following facts. Plaintiff was born with Down syndrome in 1958. She is severely mentally retarded and nonverbal. The Norwalk Probate Court determined that plaintiff is incompetent and appointed her sister, Linda Quadrini, as her conservator. At all times relevant to the complaint, plaintiff has been under the care of the Connecticut Department of Mental Retardation, now known as the Department of Developmental Services ("DDS"). She has suffered from periodontal disease since at least 1984.

A. *Plaintiff's Treatment History*

From December 1978 through February 1984, plaintiff was voluntarily committed at the Hartford Regional Center, an institution for developmentally disabled persons. In March 1984, pursuant to Medicaid's Home and Community Based Services Waiver Program (HCB-Waiver Program), DDS transferred plaintiff to the Pine Drive Group Home operated by defendant CLASP in Westport, Connecticut. The state had the authority to remove plaintiff

from CLASP at any time and, being voluntarily committed, she was free to leave at any time.

Until 1989, CLASP had an oral hygiene program in place for plaintiff that included treatment for her periodontal disease. In July 1989, plaintiff's dentist, Dr. Hill, recommended that plaintiff be referred to a pediatric dentist for dental care under general anesthesia.  CLASP never made this referral.

From April 1990 through September 2002, CLASP arranged for plaintiff to receive dental care from Dr. Mark Feigen at the Norwalk Hospital Dental Clinic.[2]  Plaintiff's records during this period indicate that she visited the dentist every six months, though several dentists previously recommended that she should be seen by a dentist every one to three months.

When Dr. Feigen began treating the plaintiff, he was not aware that she had periodontal disease.  Dr. Feigen did not speak with any of the dentists who had treated the plaintiff before. Nor did he read her medical history.  He did not diagnose plaintiff with periodontal disease until September 20, 2002, when he extracted seventeen of her teeth.

Robin Teplica, a dental hygenist, began working with Dr.

---

[2]In 1990, 1991, and 1992, Dr. Feigen signed a "State of Connecticut Department of Mental Retardation Attending Dentist Certificate" for CLASP agreeing to "assume responsibility for the total dental care rendered in this facility as required by the Regulations of the State of Connecticut Department of Mental Retardation."

3

Feigen in June 1999. The first time she saw the plaintiff, on December 14, 1999, she could tell that the plaintiff had periodontal disease because of plaintiff's "perio-breath," and her mobile teeth, which moved when Dr. Feigen brushed them. Teplica notified Dr. Feigen and CLASP staff that the plaintiff had periodontal disease.

Plaintiff was often uncooperative at her dental appointments. The hygienists and Dr. Feigen regularly discussed plaintiff's uncooperativeness with CLASP staff. Plaintiff was also uncooperative when CLASP staff brushed her teeth at the group home. This lack of cooperation was not noted in CLASP's service plans or quarterly reports, and plaintiff's conservator was never advised of the possibility that plaintiff's dental care was inadequate.

At plaintiff's July 2001 dentist appointment, Teplin recommended that plaintiff receive a cleaning under sedation. One year later, however, no appointment had been made. At plaintiff's July 2002 appointment, Teplin again recommended placing the plaintiff under general anesthesia so that the dentist could properly clean her teeth and extract certain teeth.

In September 2002, CLASP nurse Kathy Stuart contacted plaintiff's conservator in order to obtain consent for the cleaning, extractions and general anesthesia. Stuart and the conservator never spoke directly and the conservator was never

4

orally informed of the risks of the procedure or the likely outcome. The conservator did, however, sign the consent forms authorizing the procedure. These forms indicated that the plaintiff would undergo anesthesia for x-rays, examination, cleaning, restoration and extraction.

On September 20, 2002, Dr. Feigen cleaned plaintiff's teeth and extracted seventeen teeth while plaintiff was anesthetized. Neither CLASP nor the dentist informed plaintiff's conservator of the outcome of the surgery until the conservator noticed in November 2002 that plaintiff was missing several teeth. DDS subsequently investigated the incident and determined that CLASP was negligent in waiting one year to schedule the cleaning.

B. *Community Based Services*

Under the Home and Community Based Services Act, 42 U.S.C. § 1396n, states may request a waiver of applicable federal Medicaid requirements to provide enhanced community support services to Medicaid beneficiaries who would otherwise require institutional care. Underlying the HCB-Waiver Program is a recognition that home or community-based care is often both cheaper and more patient-attentive than institutional care. To qualify for a waiver, a state must develop alternative regulatory schemes aimed at lowering the cost of medical treatment while maintaining the level of care.

Connecticut obtained a waiver permitting it to use Medicaid

funds to place Medicaid beneficiaries in community care programs operated by CLASP. CLASP's group homes, including Pine Drive, are therefore subject to state regulations and inspections. The state requires that all clients placed in private group homes have a DDS case manager who works with clients and families to identify client needs and refer clients to appropriate service providers with timely follow-up. The DDS case manager is also responsible for convening and chairing the Interdisciplinary Team ("IDT"), which develops and modifies a client's Overall Plan of Service ("OPS"). The OPS is aimed at identifying and addressing the particular needs of the client.

Defendant Sweet was plaintiff's DDS case manager at all times relevant to this case. As a result of an increase in her caseload, she informally transferred many of her duties to the CLASP defendants, though she did continue to attend the IDT meetings. Though plaintiff's application to Pine Bluff noted that she had periodontal disease, concerns about her periodontal disease and dental care were never discussed at the IDT meetings.

II. Discussion

Pending before the court are three motions for summary judgment from three classes of defendants: the DDS defendants, Sybil Sweet and Peter O'Meara; the CLASP defendants, CLASP Homes, Inc., and Kathy Stuart; and the hospital defendants, Norwalk Hospital and Dr. Feigen. Two common questions unite the three

motions, at least as to the federal claims.  The first is whether plaintiff, as a voluntarily committed person, can sustain a substantive due process claim based on the defendants' alleged deprivation of her right to adequate medical and dental care. The second question is whether § 1396n(c)(2)(A) of the Medicaid Act creates a private right of action enforceable in federal court.  After careful review, I conclude that the answer to both questions is "no," and therefore grant defendants' motions for summary judgment on the federal claims.

   A.   *Legal Standard*

   Summary judgment may be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  The moving party has the initial burden of showing that there is an absence of evidence to support the other party's claims.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  To avoid summary judgment, the non-moving party must point to evidence that would permit a jury to return a verdict in his or her favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  In determining whether this standard is met, the evidence must be viewed in a manner most favorable to the non-moving party.  Id. at 255.

   B.   *Substantive Due Process*

   Plaintiff alleges that the defendants' failure to provide her with necessary care and treatment "so substantially departed

7

from accepted professional standards as to indicate professional judgment was not exercised[,] in violation of the Due Process Clause of the Fourteenth Amendment." (Compl. ¶ 61.) Defendants argue that because plaintiff was voluntarily committed, she has no substantive due process right to adequate treatment.

In Youngberg v. Romeo, 457 U.S. 307, 321-22 (1982), the Supreme Court recognized a due process right of institutionalized persons to "professional judgment" in the provision of their care. The Second Circuit held in Society of Good Will to Retarded Children, Inc. v. Cuomo, 737 F.2d 1239, 1243 (2d Cir. 1994), that residents of state-operated institutions for the mentally disabled "have a constitutional right to adequate food, shelter, and medical care." However, the substantive due process right recognized in Youngberg and Society of Good Will is available only to persons who are involuntarily committed to the state's custody. See Suffolk Parents of Handicapped Adults v. Wingate, 101 F.3d 818 (2d Cir. 1996); Brooks v. Giuliani, 84 F.3d 1454 (2d Cir. 1996).

Most courts addressing this issue are willing to look beyond the mere fact of whether a plaintiff was voluntarily or involuntarily institutionalized in the first instance, to explore whether the plaintiff's confinement has *in fact* become involuntary. See generally, Campbell v. Washington, 2009 WL 2985481, at *5 (W.D. Wash. Sep. 14, 2009). Here, however,

8

plaintiff has made no allegation that she was in fact barred from leaving the CLASP home, nor is there any evidence in the record to suggest that the State could have barred her from leaving.

Plaintiff is thus unable to state a claim for a violation of her substantive due process rights under Youngberg because she was not being held at the CLASP facility against her will.

C.  Section 1396n(c)(2)(A)

Plaintiff claims that defendants' failure to provide her with necessary care and treatment violated her rights under the Home and Community Based Services Waiver Act, 42 U.S.C. § 1396n(c). Specifically, she contends that defendants violated § 1396n(c)(2)(A), in that they failed to protect her health and welfare as required in order to receive an HCB waiver. The vehicle for plaintiff's claim is 42 U.S.C. § 1983, which supplies a remedy for the vindication of rights secured by federal statutes. Gonzaga Univ. v. Doe, 536 U.S. 273, 284 (2002). However, "to seek redress through § 1983, . . . a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*." Blessing v. Freestone, 520 U.S. 329, 340 (2002) (emphasis in original). Therefore, plaintiff must first establish that § 1396n(c)(2)(A) creates an individual right privately enforceable through § 1983.[3] Because I conclude that §

---

[3] Alternatively, plaintiff may show that § 1396n(c)(2)(A) itself creates an implied right of action. The implied-right-of-action analysis is largely the same as the § 1983-cause-of-action

9

1396n(c)(2)(A) does not create a privately enforceable right, I grant defendants' motion for summary judgment on Count Two.

The HCB Waiver Act was passed pursuant to Congress' spending power. "In legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 28 (1981). The Supreme Court has recognized a private right of action even in spending clause cases, but it has clarified that such a right of action exists only when Congress' intent to permit private enforcement of the federal law is unambiguous. See Gonzaga Univ. v. Doe, 536 U.S. 273, 280 (2002). In recent years, the Court has been cautious to recognize private rights of action in statutes enacted under the spending clause. See Kapps v. Wing, 404 F.3d 105, 127 (2d Cir. 2005).

In Blessing v. Freestone, 520 U.S. 329(1997), the Supreme Court outlined a three-pronged framework for determining whether a federal statute provides a private right of action under §

---

analysis. See Gonzaga University v. Doe, 536 U.S. 273, 283 (2002). The only relevant difference between the two analyses is that a plaintiff seeking to pursue an implied right of action directly under the relevant statute must show not only that the statute creates a private right, but also that it creates a private remedy. Id. at 284. Because it is clear that § 1396n(c)(2)(A) does not create a private remedy, the analysis in the text focuses on whether it creates a private right of action enforceable through § 1983.

10

1983. "First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted rights must be couched in mandatory, rather than precatory, terms." Id. at 340-41.

Subsequently, in Gonzaga University v. Doe, 536 U.S. 273 (2002), the Court sought to clarify the Blessing test, emphasizing that only an unambiguously conferred right can support a private right of action under § 1983. Id. at 283 (rejecting the holdings of some lower courts that Blessing allows plaintiffs to enforce a statute under § 1983 provided the plaintiff falls within the general zone of interest that the statute is intended to protect). Gonzaga made clear that "where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or an implied right of action." Id. at 286.

With regard to the first prong of the Blessing test, therefore, it is not enough for Congress to intend that the provision in question benefit the plaintiff. Instead, the statute must use "explicit rights-creating" terms, id. at 284

11

with an "unmistakable focus on the benefitted class," id. (quoting Cannon v. University of Chicago, 441 U.S. 677, 691 (1979). As examples of statutes whose language unambiguously confer private rights, the Gonzaga court cited Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972, both of which contain the same explicit rights-creating language: "*No person* in the United States *shall* . . . be subjected to discrimination . . . ." Id. at 284 n. 3 (quoting 42 U.S.C. § 2000d; 20 U.S.C. § 1681(a).

The second Blessing prong concerns whether the right asserted by the plaintiff is "vague and amorphous" and therefore not within the institutional competence of the judiciary to enforce. The Supreme Court has sent mixed messages regarding what makes an asserted right too vague or amorphous to enforce. In Wilder v. Va. Hosp Ass'n, 496 U.S. 498 (1990), the Court found that a provision of the Medicaid Act that granted Medicaid providers a right to "reasonable and adequate" reimbursement was not beyond the competency of the judiciary to enforce. Id. at 519. However, in more recent cases, the Court has been less willing to read enforceable rights of action into vague statutes. In Suter v. Artist M., for example, the Court refused to find a private right of action under the Adoption Assistance and Child Welfare Act, which required states to make "reasonable efforts" to keep children out of foster homes. 503 U.S. 347, 363 (1992).

Though the statute at issue in <u>Suter</u> used similar language to the provision at issue in <u>Wilder</u>, the Court found that it was too vague to be enforceable. <u>Id.</u> at 360

The third prong of the <u>Blessing</u> test is relatively straightforward. As mentioned, in order for a statute to confer an enforceable private right, it must "unambiguously impose a binding obligation on the States," and must be cast in "mandatory, rather than precatory, terms." <u>Blessing</u>, 520 U.S. at 329. For purposes of this case, it is not disputed that § 1396n(c)(2)(A) satisfies this prong of the <u>Blessing</u> test.

Turning to the language of the statute at issue here, it provides as follows:

> (2) A waiver shall not be granted under this subsection unless the State provides assurances satisfactory to the Secretary that —
>
> (A) necessary safeguards (including adequate standards for provider participation) have been taken to protect the health and welfare of individuals provided services under the waiver and to assure financial accountability for funds expended with respect to such services.

42 U.S.C. § 1396n(c)(2)(A). I conclude that this statute does not provide a private right of action because it does not contain rights-creating language. Having reached this conclusion, I do not address the question whether any such right would be too vague and amorphous for judicial enforcement.[4]

---

[4]Since <u>Gonzaga</u> was decided, only two courts appear to have considered whether § 1396n(c)(2)(A) confers a private right of

Though § 1396n(c)(2)(A) refers to "individuals," it is not phrased in explicit rights-creating terms. The rights-creating statutes identified in Gonzaga provide that "*[n]o person* in the United States *shall* . . . be subjected to discrimination . . . ." 536 U.S. at 284 n. 3. The HCB-Waiver Program merely provides that, in order to receive a waiver, a state must "provide assurances" that "safeguards" are in place to protect individuals. This language encourages the state to enact policies that generally benefit a particular class but stops short of carving out an individual right that a state must not

---

action and they reached opposite conclusions. In Masterman v. Goodno, No. Civ. 03-2939 (JRT/FLN), 2004 WL 51271, at *10 (D. Minn. Jan. 8, 2004), Judge Tunheim concluded that "the history of Medicaid legislation, in combination with the language of the particular statutes at issue, evidences an intent to allow private enforcement of § 1396n(c)(2)(A)." The court reasoned that, "[a]lthough section 1396n(c)(2)(A) may speak to the state, more importantly it speaks of beneficiaries. Id. at *9. With regard to Blessing's second prong, the court held that "[t]he right is not vague or amorphous, and is enforceable by the judiciary." Id. at *10. More recently, in Gaines v. Hadi, No. 06-60129-CIV, 2006 WL 6035742, at *24, (S.D. Fla. Jan. 30, 2006), Judge Seitz concluded that § 1396n(c)(2)(A) does not provide a private right of action. Applying the Blessing factors in light of Gonzaga, the court found that "section 1396n(c)(2)(A) focuses on the aggregate practices of the states in establishing their Medicaid plans rather than on individual entitlements to services." Id. at 23. The court also decided that the purported right is vague and amorphous. Id. at 23. The "assurances" the State must provide to the Secretary, the court observed, "are no less fuzzy or amorphous than the "reasonable efforts" held not to create a private right of action in Suter." Id. The Gaines decision is consistent with Second Circuit guidance on the Gonzaga-Blessing analysis. See Rabin v. Wilson-Coker, 362 F.3d 190, 201 (2d. Cir. 2004).

14

violate.

Gonzaga held that the Family Educational Rights and Privacy Act ("FERPA") does not create an individual right because it has an aggregate focus. Id. FERPA prohibits states from providing federal funding to schools that have a "policy or practice" of disclosing student records. Id. The Second Circuit has observed that statutes like FERPA have an aggregate focus because they are two steps removed from individual plaintiffs and they contain qualifying language. See Rabin, 362 F.3d at 201.

Like FERPA, 1396n(c)(2)(A) is "two steps removed from the interests" of individual plaintiffs. See id. at 201-02. The Gonzaga plaintiffs' interest was in the Secretary ensuring that the State ensured that the school did not disclose records. Similarly, in the present case, the plaintiff's interest is in the Secretary ensuring that the State ensures that Pine Drive provides for her health and welfare. Her interests are thus two steps removed from the statute.

Moreover, 1396n(c)(2)(A) contains qualifying language. FERPA prohibits states from funding schools that have a "policy or practice" of disclosing records, but it does not necessarily prohibit states from funding every school that discloses a record. Similarly, 1396n(c)(2)(A) requires states to ensure that providers provide for the health and welfare of individuals in a financially accountable manner, not to ensure that individual

15

health and welfare is necessarily provided for to a particular degree. The statute thus focuses on the competing concerns that the state and the Secretary must balance when using Medicaid funds for community care: "the health and welfare of individuals" on the one hand and "financial accountability for funds" on the other. 1396n(c)(2)(A). As such, it has an aggregate focus on state procedures, not an individual focus on consumer rights.[5]

For these reasons, I conclude that, in enacting § 1396n(c)(2)(A), Congress did not clearly and unambiguously intend to create a privately enforceable right. Accordingly, I grant defendants' motions for summary judgment on Count Two.

D. *State Law Claims*

When federal claims are dismissed before trial leaving only state law claims, it usually is appropriate for a district court to decline to exercise jurisdiction over the remaining state law claims. See 28 U.S.C. §1367(c)(3). There is no reason to depart from this practice here.

III. Conclusion

Accordingly, defendants' motions for summary judgment are hereby granted as to the federal claims, which are dismissed with

---

[5] § 1396r-6, in which Rabin found a private right, was only one step removed from the plaintiff and contained no qualifying language. 362 F.3d at 201-02. The plaintiff's interest was in the Secretary ensuring that the State extend benefits for six-months when a family becomes ineligible and the six-month extension requirement is unqualified. See id.

prejudice, and I decline to exercise jurisdiction over the state law claims, which are dismissed without prejudice.

So ordered this 31st day of March 2010.

/s/ Robert N. Chatigny, USDJ
Robert N. Chatigny
United States District Judge